**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ORLANDO A. ACOSTA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-2528** |
| | : | |
| **GOVERNOR TOM WOLF,** *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                        **June 10, 2020**

Philadelphian Orlando A. Acosta wants us to place him on the November 3, 2020 general election ballot as an independent candidate for the United States House of Representatives even though he may not secure the required 1,000 signatures of registered voters needed for his election petition by August 3, 2020.  He *pro se* sues Pennsylvania Governor Tom Wolf and Secretary arguing enforcing Pennsylvania's election law requiring 1,000 signatures of registered voters deprives him of equal protection and violates the Americans with Disabilities Act of 1990 because COVID-19 mitigation and stay home orders (as well as a couple days of civil unrest concerning police actions towards African-Americans) impede his ability to presently acquire the 1,000 signatures on his petition not due until August 3, 2020.  He filed here without paying the fees requiring us to screen his complaint for merit.  Although we found his sworn statements of substantial expense with no income to be curious, we relied upon Mr. Acosta's sworn oath and granted leave to proceed *in forma pauperis*.  Congress requires we now screen his case for merit before we cause the Marshal to effect service and the Defendants to respond.

Mr. Acosta does not state a claim for either depriving him of equal protection or discriminating against him in seeking employment due to a disability.   We dismiss Mr. Acosta's complaint with leave to timely amend his complaint if he can do so consistent with the Law.

I.      **Alleged *pro se* facts.**

Orlando A. Acosta alleges he cannot get the required 1,000 registered voters to sign his petition to appear on the ballot as an independent candidate for the United States House of Representatives election on November 3, 2020.[1]  Under Pennsylvania Law, Mr. Acosta will not appear on the ballot as a candidate if he fails to collect 1,000 signatures by the filing deadline.[2] The petition must be submitted to the Secretary of the Commonwealth by August 3, 2020.

Mr. Acosta alleges he cannot collect the 1,000 signatures because of the emergency stay-at-home order issued by the Mayor of Philadelphia to mitigate the ongoing COVID-19 pandemic.[3] With registered voters ordered to remain at home, Mr. Acosta pleads he cannot share his political platform with registered voters and have his petition signed.[4]  Even when the emergency stay-at-home order expires (as it did last week), Mr. Acosta alleges he still does not want to interact with registered voters because there is no vaccine for COVID-19 and his disability and asthma place him at a higher risk for contracting a severe coronavirus infection.[5]

Mr. Acosta asks us to order Pennsylvania Governor Wolf and Secretary Boockvar to exempt him from Pennsylvania's signature requirement and then place him on the November 3, 2020 general election ballot.[6]  He claims he is entitled to this extraordinary relief because the Pennsylvania signature requirement in light of COVID-19 mitigation and coupled with his preexisting medical conditions, violates the Equal Protection Clause of the Fourteenth Amendment and discriminates against him in his employment opportunities under the Americans with Disabilities Act of 1990.[7]

II.     **Analysis**

Mr. Acosta sued without paying the required fees and then moved to proceed *in forma pauperis* under 28 U.S.C. § 1915.  We granted him leave to proceed following review of his sworn

declaration of income and assets.  Congress requires, upon granting him leave to proceed without paying the fees, we must screen his complaint for merit.  If his claim lacks merit, we dismiss before causing the Clerk of Court to issue summons, the Marshal to effect service, and the defendants to incur costs and fees in responding.  When considering whether to dismiss a complaint for failure to state a claim under § 1915(e)(2)(B)(ii), we use the same standard used under Federal Rule of Civil Procedure 12(b)(6).[8]  "'[A] complaint must contain sufficient factual allegations, taken as true, to 'state a claim to relief that is plausible on its face.'"[9]  "We accept all factual allegations in the complaint as true and construe those facts in the light most favorable to the plaintiff."[10]  We are directed by our Court of Appeals to be "mindful of our 'obligation to liberally construe a *pro se* litigant's pleadings …'"[11]

The issue is whether Mr. Acosta states a claim for equal protection and disabilities discrimination because he claims to be unable to access potential voters to sign his election petition.  We begin by taking judicial notice of two facts concerning this year's election: Pennsylvania requires individuals seeking to appear on the ballot as a candidate for the United States House of Representatives to collect signatures from at least one thousand registered voters.[12]  Candidates for this election cycle must submit the signed petition by August 3, 2020.[13]

Mr. Acosta's *pro se* complaint does not specify his relief under Federal Rule of Civil Procedure 8(a)(2).[14]  Under Rule 8(a)(2), Mr. Acosta does not need to provide detailed allegations, and as a *pro se* plaintiff we liberally construe Mr. Acosta's factual allegations as true and draw all reasonable inferences in his favor.  While his allegations are scant at best, we can discern his argument and requested relief.

### A.      Mr. Acosta fails to state a claim under the Equal Protection Clause.

Mr. Acosta claims Pennsylvania Law requiring 1,000 signatures during the COVID-19 pandemic violates his equal protection rights.

The Equal Protection Clause of the Fourteenth Amendment demands, "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws."[15]  Mr. Acosta alleges the Governor and Secretary, by enforcing Pennsylvania Law, violate his right of "equal protection of the laws" by requiring him to collect 1,000 signatures to appear on the ballot as an independent candidate.[16]

To make a valid equal protection claim, Mr. Acosta must show "intentional discrimination."[17]  He does not identify a status or characteristic giving rise to discrimination.  We do not know his political party.  It is not enough for Mr. Acosta to allege he is discriminated against as an independent candidate.[18]  Even if his status as an independent candidate could give rise to a claim, Mr. Acosta must show his status as an independent candidate is a substantial factor for receiving different treatment.[19]

Mr. Acosta could apply three different standards to show "intentional discrimination" in his equal protection claim.[20]  First, Mr. Acosta could allege the Commonwealth's signature-requirement statute "by its own terms" singles out independent candidates for different treatment.[21]  This standard does not apply to the present action, because Pennsylvania law at section 2872.1(12) does not "by its own terms" distinguish between party-affiliated and independent candidates.  Second, Mr. Acosta could plead the statute makes no explicit or implicit reference to a classification but is "designed to impose different burdens on different classes of persons."[22]  This standard does not apply here because Mr. Acosta does not allege Pennsylvania law at section 2872.1(12) is designed to force burdens on one class of persons, independent candidates, different

from another class of persons, party-affiliated candidates.  Or, third, Mr. Acosta could allege the statute makes no explicit or implicit reference to a classification but government officials administering the law apply it "with different degrees of severity to different groups of persons … described by some suspect trait."[23]  We infer Mr. Acosta seeks to proceed under the third standard.[24]  Mr. Acosta alleges the emergency stay-at-home order issued by the Mayor of Philadelphia to mitigate the ongoing COVID-19 pandemic aims to stop his campaign as an independent candidate.[25]

Once a plaintiff shows different treatment as the result of "intentional discrimination," our Court of Appeals binds us to determine the appropriate standard of review.[26]  The first standard of review is strict scrutiny.[27]  Strict scrutiny applies to classifications based on race, national origin, or religion.[28]  Because Mr. Acosta does not allege a classification along these traits, strict scrutiny does not apply here.

The second standard of review is intermediate scrutiny.[29]  Intermediate scrutiny applies when classifications are based on gender and illegitimacy.[30]  Because Mr. Acosta does not allege "intentional discrimination" based on these traits, intermediate scrutiny does not apply to the present action.

The third standard of review is rational-basis review.[31]  All classifications not listed under strict or intermediate scrutiny are reviewed under this standard.[32]  Mr. Acosta's inferred classification— party affiliation—falls within the scope of the rational basis review.

We must now confront whether the "intentional discrimination" alleged by Mr. Acosta as an independent candidate is justifiable.  Justifiable "intentional discrimination" exists where: first, the state has a legitimate interest in the issue raised by the plaintiff; and second, the state's interest

advances a rational governmental purpose.[33]  If the state can succeed on both factors, then the plaintiff's equal protection claim fails.[34]

First, the Commonwealth has a legitimate interest in regulating its elections, including who has access to the ballot as a candidate.[35]  The Constitution mandates: "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall for be prescribed in each State by the Legislature thereof[.]"[36]  The Commonwealth's signature-requirement statute reflects the state's valid interest to regulate the manner in which candidates qualify for elections.

Second, the Commonwealth's interest advances a rational governmental purpose.  State regulation of elections is necessary "as a practical matter … if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."[37]  The Commonwealth's interest to place candidates who have collected 1,000 signatures from registered voters on the ballot in a United States House of Representations election is necessary because such a procedure minimizes "frivolous candidates."[38]  Pennsylvania law at section 2872.1(12) provides the Commonwealth with a method to measure the seriousness of a candidacy and the public support backing a candidate.[39]

The limited caselaw in the last ten weeks addressing the effect of a global pandemic on petition rights confirms  the state's interest to regulate access to ballots "is of the highest order."[40]  For example, in *Garbett v. Herbert*, the plaintiff alleged the state's ballot access framework applied during the COVID-19 virus prevented her from gathering the necessary 28,000 signatures to appear on the ballot as an independent candidate in the 2020 Utah gubernatorial election.[41]  The Utah governor's "Stay Safe, Stay Home" Directive to reduce the spread of the coronavirus, she pled, violated her equal protection rights because the executive emergency order constituted intentional discrimination against "candidates who pursue the Signature-Gathering Route."[42] Like

Mr. Acosta, the plaintiff asked for relief in the form of automatic placement on the ballot.[43] Because strict scrutiny nor intermediate scrutiny addressed the plaintiff's classification, the district court applied rational basis review.[44]  The court ruled the state had a compelling interest to regulate elections and such an interest ensured candidates who "demonstrate a modicum of voter support before securing a place on a ballot."[45]  The district court then denied plaintiff's proposed relief as "insufficient to demonstrate a threshold showing of support under the circumstances."[46]

The District Court for the Northern District of Illinois reached a similar holding in *Libertarian Party of Illinois v. Pritzker*.[47]  The plaintiffs, representing the Libertarian Party of Illinois and the Illinois Green Party, sued the Illinois governor alleging his emergency stay-at-home order to mitigate the COVID-19 pandemic prevented candidates from the two political parties from gathering the necessary number of signatures to appear on the ballot in the November 2020 election.[48]  The plaintiffs pled the governor's emergency executive order violated the Equal Protection Clause.[49]  The plaintiffs' proposed relief asked the court to modify the state's signature-requirement law because of the coronavirus pandemic.[50]  The district court upheld the state's ballot access framework, ruling the state had a compelling interest to pass election laws measuring whether a new party or independent candidate received a modicum of public support sufficient to warrant ballot access.[51]  The district court rejected granting plaintiffs automatic placement on the ballot because "[s]uspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support" would require the court to modify state election law procedures "beyond [our] typical variations."[52]

The District Court for the Southern District of New York found similar grounds in denying relief to appear on the ballot based on COVID-19 orders in *Murray v. Cuomo*.[53]  The plaintiff alleged she could not satisfy New York's ballot access laws to appear on the state's primary

election ballot as a candidate for the United States House of Representatives because of the governor's stay-at-home order to reduce the spread of COVID-19.[54] The plaintiff claimed the state violated her equal protections rights.[55] The district court considered the plaintiff's proposed relief to alter the state's ballot access framework.[56] But the district court recognized "[o]f particular importance, this is Ms. Murray's second attempt to use the courts to have her name placed on the June 23 [primary election] ballot."[57] The district court held "[t]he public interest is served by respecting the State's interest and expertise in regulating elections"[58] and refused to modify state's election law restrictions. The plaintiff, the district court concluded, "need[s] to comply with all portions of the Election Law."[59]

We agree with our colleagues in Utah, Illinois, and New York. We also distinguish Mr. Acosta's equal protection claim as a candidate for public office from registered voters raising absentee ballot voting claims amid the COVID-19 pandemic. The Supreme Court protects the right of voters to participate in an election by absentee ballot rather than attending an official polling station to cast a vote.[60]

But seeking to be on the ballot is a different issue; the Supreme Court has upheld the state's interest to require a candidate to make a preliminary showing of substantial support to qualify for a place on the ballot as an "undoubted right."[61] The state's interest to regulate ballots is necessary because the compelling interest allows states to "avoid[] confusion, deception, and even frustration of the democratic process at the general election."[62] And most recently during the COVID-19 pandemic, the Supreme Court ruled the state interest must be upheld when a major natural disaster coincides with an election because "when a lower court intervenes and alters the election rules … close to the election date … this Court, as appropriate [will] correct the error."[63] We will not

modify the Commonwealth's signature requirement statute for Mr. Acosta based on his present pleading of an equal protection claim.

The Commonwealth easily passes the rational-basis review.  The Commonwealth has a legitimate state interest to regulate its ballot access framework.  The legitimate state interest advances the governmental purpose of presenting registered voters with serious candidates to choose from for public office. We will not circumvent the Commonwealth's signature-requirement statute.

Even assuming we liberally construed Mr. Acosta's "intentional discrimination", he fails to show entitlement to relief under an equal protection theory as the Commonwealth's signature laws have a rational basis.

### B.    Mr. Acosta fails to state a claim under the ADA.

In a separate filing, Mr. Acosta claims Pennsylvania Law requiring 1,000 signatures during the COVID-19 pandemic violates the ADA as a form of employment discrimination.[64]  Given his *pro se* status, we will consider Mr. Acosta's second filing as part of his complaint as it explains his claims but also adds a disabilities discrimination claim.

Congress passed the ADA, in part, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]"[65]  Mr. Acosta pleads as a disabled and asthmatic individual, enforcement of Pennsylvania Law at section 2872.1(12) to appear on the United States House of Representatives election ballot discriminates against him in his employment under the ADA.[66]

Mr. Acosta is not entitled to relief against the Governor and Secretary for disabilities discrimination.  Mr. Acosta may believe running for public office is similar to applying for a job with the federal government, but this view is mistaken.  An "employer" as defined in Title I of the

ADA, does not include "the United States, a corporation wholly owned by the government of the United States, or an Indian tribe[.]"[67]  We cannot grant relief for an individual seeking a seat in the United States House of Representatives.

Even if we could grant relief for Mr. Acosta under his ADA claim, he fails to plead facts which would allow us to infer a "disability" as defined by Congress in the ADA.[68]  Mr. Acosta does not allege how he lives with a physical or mental impairment "that substantially limits one or more major life activities."[69]

Mr. Acosta also does not plead how Pennsylvania's signature requirement discriminates against him.[70]  The Commonwealth imposes the same 1,000 signature requirement on all individuals working to appear on the ballot as a candidate for the United States House of Representatives.  All of Mr. Acosta's competitors are constrained by the COVID-19 pandemic. No state law nor the COVID-19 pandemic has demanded Mr. Acosta cease collecting signatures. Nothing prohibits Mr. Acosta from asking volunteers or hiring assistance to help gather signatures either.[71]

Mr. Acosta fails to state an ADA claim.

**III.   Conclusion**

Mr. Acosta *pro se* sues the Governor and Secretary challenging the present enforcement of the signature requirement under Pennsylvania election law violates the Equal Protection Clause of the Fourteenth Amendment and the Americans with Disabilities Act of 1990.  Mr. Acosta failed to state a claim upon which relief can be granted.  We must now dismiss. As Mr. Acosta is proceeding *pro se* and he may be able to plead another claim not barred by the Law, we grant him leave to timely amend if he can do so consistent with the Law.  Absent timely amendment, we will dismiss the case with prejudice.

---

[1] Mr. Acosta's facts are detailed in ECF Doc. No. 1, at p. 8.

[2] 25 Pa. Stat. and Cons. Stat. Ann. § 2872.1(12) (West 2020).

[3] ECF Doc. No. 1, at p. 8.

[4] *Id.*

[5] *Id.*; ECF Doc. No. 6, at p. 1.

[6] ECF Doc. No. 6, at p. 1.

[7] *Id.*

[8] *Elansari v. Univ. of Pennsylvania*, 779 F. App'x 1006, 1008 (3d Cir. 2019) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)).

[9] *Id.* (quoting *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012)).

[10] *Id.*

[11] In deciding a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party, but we "are not compelled to accept unsupported conclusions and unwarranted inference, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017) (quoting *In re Vehicle Carrier Serv. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016) (quoting *Ascroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly*

*v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

12 25 Pa. Stat. and Cons. Stat. Ann. § 2872.1(12) (West 2020).

13 Bureau of Elections and Notaries, *2020 Pennsylvania Elections Important Dates to Remember*, Commonwealth of Pennsylvania Department of State (Mar. 27, 2020), https://www.dos.pa.gov/VotingElections/CandidatesCommittees/RunningforOffice/Documents/2020/2020%20important%20dates.pdf

14 Fed. R. Civ. P. 8(a)(2).

15 U.S. Const. amend. XIV, § 1.

16 ECF Doc. No. 1, at p. 2, 8.

17 *Washington v. Davis*, 426 U.S. 229, 241 (1976); *Pers. Adm'r of Mass. v. Feeney*, 422 U.S. 256, 276 (1979).

18 *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

19 *Davis*, 426 U.S. at 235; *Feeney*, 422 U.S. at 276.

20 *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015).

21 3. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.4 (10th ed. 2012).

22 *Id.*

23 *Id.*

24 *See, e.g.*, *Yick Wo. Hopkins*, 118 U.S. 356, 373-74 (1886) ("In the present cases … the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration … as to amount to a practical denial by the state of that equal protection of the laws which is secured … by the broad and benign provisions of the fourteenth amendment to the constitution of the United States.").

25 ECF Doc. No. 1, at p. 8.  Mr. Acosta focuses on a Philadelphia Order affecting his equal protection rights but does not sue a Philadelphia official presumably because Philadelphia does not control the election ballot.

26 *Hassan*, 804 F.3d at 298.

27 *Id.*

[28] *Id.* at 301; *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

[29] *Hassan*, 804 F.3d at 298-99.

[30] *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

[31] *Hassan*, 804 F.3d at 298.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Lubin v. Panish*, 415 U.S. 709, 715 (1974) (citing *Bullock v. Carter*, 405 U.S. 134, 144-45 (1972)).

[36] U.S. Const.  art. I, § 4, cl. 1.

[37] *Storer v. Brown*, 415 U.S. 724, 730 (1974).

[38] *Lubin*, 415 U.S. at 715.

[39] *Id.*

[40] *See Lubin*, 415 U.S. at 715 (citing *Bullock v. Carter*, 405 U.S. 134, 144-45 (1972)).

[41] *Garbett v. Herbert*, No. 20-245, 2020 WL 2064101, at *1, *15 (D. Utah Apr. 29, 2020).

[42]  *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* at *17.

[46] *Id.*

[47] *Libertarian Party of Illinois v. Pritzker*, No. 20-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020).

[48] *Id.* at *1.

[49] *Id.* at *2.

[50] *Id.* at *1.

[51] *Id.* at *4.

[52] *Id.*

[53] *Murray v. Cuomo*, No. 20-03571, 2020 WL 2521449 (S.D.N.Y. May 18, 2020).

[54] *Id.* at *1.

[55] *Id.* at *4.

[56] *Id.* at *1

[57] *Id.*

[58] *Id.* at *15.

[59] *Id.* at *13.

[60] *See, e.g., Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205, 1206 (2020).

[61] *Anderson v. Celebrezze*, 460 U.S. 780, n.9 (1983).

[62] *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

[63] *Republican National Committee*, 140 S. Ct. at 1207.

[64] ECF Doc. No. 6, at p. 1.

[65] 42 U.S.C. § 12101(b)(1) (2020).

[66] ECF Doc. No. 6, at p. 1.

[67] 42 U.S.C. § 12111(5)(B) (2020).

[68] *Id.* § 12102(1).

[69] *Id.* § 12112.

[70] *Id.*

[71] *See, e.g., Graveline v. Johnson*, 336 F. Supp. 3d 801, 816 (E.D. Mich. 2018) (mentioning plaintiff lobbied 231 volunteers and paid for a signature-gathering firm to help collect the 14,157

signatures necessary to appear on the ballot); *Garbett*, 2020 WL 2064101, at *2 (noting plaintiff contracted with two firms to collect 50,000 signatures).